**MARTIN F. SCHEINMAN, ESQ.**
*Arbitrator/Mediator*
THIRTY EIGHT ARDEN LANE
SANDS POINT, NEW YORK 11050

516-944-1700 TEL
516- 944-1771 FAX
OfficeMFS@gmail.com E-MAIL

May 25, 2016

<u>**Via E-Mail and Regular Mail**</u>
Robert R. Perry, Esq.
Jackson Lewis, P.C.
666 Third Avenue, 29th Floor
New York, NY 10017

Kathleen M. Keller, Esq.
Bredhoff & Kaiser, P.L.L.C.
805 15th Street NW, Suite 1000
Washington, DC 20005

Re:     **Domtar Corporation**
        **and**
        **Pace Industry Union-Management Pension Fund**
        **(Withdrawal Liability)**

Dear Mr. Perry and Ms. Keller:

      Enclosed please find my Opinion and Award in the above referenced matter.

      Thank you.

Sincerely,

Martin F. Scheinman

Enclosure

MFS/sk
Domtar.PaceIndustry.withdrawal.trans

```
-------------------------------------X
In the Matter of the Arbitration
                                     X
            between
                                     X
DOMTAR CORPORATION
                                     X    Re: Withdrawal
                    "Employer"                Liability
                                     X
            - and -
                                     X
PACE INDUSTRY UNION-MANAGEMENT
PENSION FUND
                                     X
                    "Fund"
-------------------------------------X
```

**APPEARANCES**


**FOR THE EMPLOYER**
JACKSON LEWIS P.C.
   Robert R. Perry, Esq., Of Counsel


**FOR THE FUND**
BREDHOFF & KAISER, P.L.L.C.
   Kathleen M. Keller, Esq., Of Counsel
   Tanaz Moghadam, Esq., Of Counsel


**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

## BACKGROUND

This case disputes whether the amount of the annual withdrawal liability installment payment, as listed on a schedule presented by Pace Industry Union-Management Pension Fund ("Fund"), to Domtar Corporation ("Employer"), was determined in accordance with the provisions of the Employee Retirement Income Security Act ("ERISA"). The Employer claims the Fund improperly determined the amount of its annual installment payment, by including the automatic surcharge imposed by the Pension Protection Act ("PPA"), and non-bargained contribution increases imposed under a Rehabilitation Plan, in the highest contribution rate used to determine the amount of its annual installment payment. It insists the Fund's actions were improper and resulted in an overstated annual installment payment amount. The Employer asks the Fund be ordered to properly determine the Employer's highest contribution rate, without accounting for the PPA surcharge and non-bargained contribution increases imposed under a Rehabilitation Plan, and to revise the withdrawal liability annual installment payment schedule, accordingly.

2

The basic facts of this case are not in dispute. The Fund is a multi-employer pension fund. It exists to provide pension and related benefits to covered employees of employers participating in the Fund.

Prior to December 30, 2012, the Employer participated in the Fund and made contributions on behalf of covered employees in two (2) bargaining units at the Employer's facility in Ashdown Mills, Arkansas. Contributions were made at a rate of $1.574 per hour. This rate was agreed upon by the Employer and the Union representing its covered employees, in a written Participation Agreement by which the Employer undertook to participate in the Fund.[1]

On March 30, 2010, the Fund's Actuary certified the Fund was in critical status for Plan Year beginning January 1, 2010. Thereafter, on July 19, 2010, the Fund adopted a Rehabilitation Plan, an action required by law for plans in critical status.

As required by the PPA, a five (5%) percent contribution surcharge was assessed against the Employer for work performed on and after June 1, 2010, increasing to

---

[1] The Employer, Union and Fund are signatories to the Participation Agreement.

ten (10%) percent for work performed beginning in January, 2011. The Employer paid the surcharge.

The Rehabilitation Plan also imposed contribution increases, to be implemented by operation of law, pursuant to ERISA Section 305, if not adopted by the participating employers and their unions within one hundred eighty (180) days of the expiration of the applicable collective bargaining agreement.

On November 1, 2011, the Collective Bargaining Agreement ("Agreement") between the Employer and the Union representing its covered employees, expired. The contribution increases called for by the Rehabilitation Plan were not, thereafter, adopted by the Employer and Union.

On July 11, 2012, the Fund notified the Employer it was implementing the contribution increases called for by the Rehabilitation Plan, effective April 29, 2012. It also notified the Employer the separate, ten (10%) percent surcharge would remain in effect until the bargaining parties adopt an agreement consistent with the schedule under the Rehabilitation Plan.

On December 30, 2012, the Employer completely withdrew from the Fund with respect to both of its bargaining units.

By letter dated April 11, 2014, the Fund demanded the Employer pay withdrawal liability in the amount of forty six million five hundred fifty thousand eight hundred twenty five ($46,550,825.00) dollars. It proffered an annual installment payment schedule with an annual payment amount of four million two hundred forty four thousand six hundred ninety nine sixty five cents ($4,244,699.65) dollars. The Fund arrived at this annual amount by taking the average annual number of hours of work by the Employer's covered employees for which the Employer was obligated to contribute in the highest three (3) consecutive years of the ten (10) years preceding the withdrawal, and multiplying that number by the Employer's highest contribution rate as determined by the Fund.

The Fund determined the average annual number of hours in the above calculation to be 2,223,170.61, hours, derived from the period 2002 - 2004. The Employer does not dispute this calculation.

The Fund used a rate of $1.9093 as the multiplier for the above calculation. It arrived at this rate by including in the Employer's highest contribution rate, the PPA

surcharge, the non-bargained contribution increases implemented under the Rehabilitation Plan, and the contractual rate set forth in the Participation Agreement between the Employer and Union. According to the Employer, inclusion of the PPA surcharge and the non-bargained contribution increases implemented under the Rehabilitation Plan was improper and resulted in an annual withdrawal liability installment payment amount well in excess of the payment amount authorized by ERISA.[2]

The Fund demanded the annual payment amount be remitted, monthly, in level payments of three hundred fifty five thousand eight hundred sixty dollars thirteen cents ($355,860.13), for two hundred forty (240) months, beginning June 1, 2014.

Thereafter, the Employer made a timely request to the Fund for review of its demand. After conducting a review, the Fund adhered to its determination. The parties remained

---

[2] According to the Employer, the proper annual withdrawal liability installment payment amount, after excluding the PPA surcharge and the contribution rate increase imposed under the Rehabilitation Plan, would be three hundred million four hundred ninety nine thousand two hundred seventy dollars fifty four cents ($3,499,270.54), or seven hundred forty five thousand four hundred twenty nine dollars forty one cents ($745,429.41) less per year than the four million two hundred forty four thousand six hundred ninety nine dollars ninety five cents ($4,244,699.95), annual amount on the Fund's schedule.

at odds over whether the Fund's calculation of the Employer's annual withdrawal liability installment payment amount was properly made.

On January 29, 2015, the Employer demanded arbitration. Thereafter, I was selected to hear the dispute. The parties agreed I would determine the case upon written submissions and without a hearing. A briefing schedule was established. The Employer submitted an Opening Memorandum of Law in Opposition to the Fund's Claim for Withdrawal Liability and an Affirmation by Robert R. Perry, Esq., dated October 23, 2015, with exhibits. The Fund submitted an Opening Brief, with attachments, and a Declaration of Allison Dye, affirmed October 26, 2015, with exhibits. The Employer then submitted a Reply Memorandum of Law and an Affirmation by Perry dated November 9, 2015, with exhibits. The Fund then submitted a Response Brief. Both parties submitted addenda containing copies of cited cases. Upon receipt of these submissions, I declared the record closed.

# DISCUSSION AND FINDINGS

## The Issues:

The basic issues presented for my determination are as follows:

1. Was the Fund's inclusion of the PPA surcharge in the rate used to calculate the Employer's annual withdrawal liability installment payment, proper under ERISA?

2. If not, what shall the remedy be?

3. Was the Fund's inclusion of contribution increases imposed under its Rehabilitation Plan, in the rate used to calculate the Employer's annual withdrawal liability installment payment, proper under ERISA?

4. If not, what shall the remedy be?

## Relevant Statutory Provisions

## ERISA SEC. 305, 29 U.S.C. Sec. 1085

(a) General Rule. For purposes of this part, in the case of a multiemployer plan in effect on July 16, 2006 –

\* \* \* \* \* \* \*

(2) if the plan is in critical status –

(A) the plan sponsor shall adopt and implement a rehabilitation plan in accordance with the requirements of subsection (e), …

\* \* \* \* \* \* \*

(e) Rehabilitation Plan Must Be Adopted For Multiemployer Plans In Critical Status

(1) In General. In any case in which a multiemployer plan is in critical status for a plan year, the plan sponsor, in accordance with this subsection –

(A) shall adopt a rehabilitation plan not later than 240 days following the required date for the actuarial certification of critical status under subsection (b)(3)(A), and

(B) within 30 days after the adoption of the rehabilitation plan –

    (i) shall provide to the bargaining parties 1 or more schedules showing revised benefit structures, revised contribution structures, or both, which, if adopted, may reasonably be expected to enable the multiemployer plan to emerge from critical status in accordance with the rehabilitation plan, and

    (ii) may, if the plan sponsor deems appropriate, prepare and provide the bargaining parties with additional information relating to contribution rates or benefit reductions, alternative schedules, or other information relevant to emerging from critical status in accordance with the rehabilitation plan.

The schedule or schedules described in subparagraph (B)(i) shall reflect reductions in future benefit accruals and adjustable benefits, and increases in contributions, that the plan sponsor determines are reasonably necessary to emerge from critical status. One schedule shall be designated as the default schedule and such schedule shall assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits (other than benefits the reduction or elimination of which are not permitted under section 1054(g) of this title) have been reduced to the maximum extent permitted by law.

\*    \*    \*    \*    \*    \*    \*

(3) Rehabilitation Plan. For purposes of this section

\* \* \* \* \* \* \*

(C) Imposition of schedule where failure to adopt rehabilitation plan

(i) Initial contribution schedule. If –

(I) a collective bargaining agreement providing for contributions under a multiemployer plan that was in effect at the time the plan entered critical status expires, and

(II) after receiving one or more schedules from the plan sponsor under paragraph (1)(B), the bargaining parties with respect to such agreement fail to adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule from the plan sponsor under paragraph (1)(B)(i), the plan sponsor shall implement the schedule described in the last sentence of paragraph (1) beginning on the date specified in clause (iii).

\* \* \* \* \* \* \*

(iii) Date of implementation

The date specified in this subparagraph is the date which is 180 days after the date on which the collective bargaining agreement described in clause (i) or (ii) expires.

(iv) Failure to make scheduled contributions

Any failure to make a contribution under a schedule of contribution rates

provided under this subsection shall be
treated as a delinquent contribution
under section 1145 of this title and
shall be enforceable as such.

\* \* \* \* \* \* \*

(7) Automatic Employer Surcharge

(A) Imposition of surcharge

Each employer otherwise obligated to make
contributions for the initial critical year
shall be obligated to pay to the plan for
such year a surcharge equal to 5 percent of
the contributions otherwise required under
the applicable collective bargaining agreement
(or other agreement pursuant to which the
employer contributes). For each succeeding
plan year in which the plan is in critical
status for a consecutive period of years
beginning with the initial critical year, the
surcharge shall be 10 percent of the
contributions otherwise so required.

(B) Enforcement of surcharge
The surcharges under subparagraph (A) shall be
due and payable on the same schedule as the
contributions on which the surcharges are based.
Any failure to make a surcharge payment shall be
treated as a delinquent contribution under
section 1145 of this title and shall be
enforceable as such.

\* \* \* \* \* \* \*

(C) Surcharge to terminate upon collective
bargaining agreement renegotiation

The surcharge under this paragraph shall cease to
be effective with respect to employees covered by
a collective bargaining agreement (or other
agreement pursuant to which the employer
contributes), beginning on the effective date of
a collective bargaining agreement (or other such

agreement) that includes terms consistent with a
schedule presented by the plan sponsor under
paragraph (1)(B)(i), as modified under
subparagraph (B) of paragraph (3).

\* \* \* \* \* \* \*

(E) Surcharge not to generate increased benefit
    accruals
Notwithstanding any provision of a plan to the
contrary, the amount of any surcharge under this
paragraph shall not be the basis for any benefit
accrual under the plan.

\* \* \* \* \* \* \*

(g) Adjustments Disregarded In Withdrawal Liability
    Determination

\* \* \* \* \* \* \*

(2) Surcharges
    Any surcharges under subsection (e)(7) shall be
    disregarded in determining the allocation of
    unfunded vested benefits to an employer under
    section 1391 of this title and in determining the
    highest contribution rate under section 1399(c)
    of this title, except for the purposes of
    determining the unfunded vested benefits
    attributable to an employer under section 1391(c)
    (4) of this title or a comparable method approved
    under section 1391(c)(5) of this title.[3]

---

[3] This provision was enacted on December 16, 2014, with an
effective date of December 31, 2014, as part of the Multi-
employer Pension Reform Act ("MPRA"). It was passed as part
of an appropriations bill which stated at paragraph 109:
"(c) Effective Date. – The amendments made by this section
shall apply to benefit reductions and increases in the
contribution rate or other required contribution increases
that go into effect during plan years beginning after
December 31, 2014 and to surcharges the obligation for
which accrue on or after December 31, 2014".

**(3) Contribution Increases Required By Funding Improvement Or Rehabilitation Plan**

**(A) In general**

Any increase in the contribution rate (or other increase in contribution levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 1391 of this title and in determining the highest contribution rate under section 1399(c) of this title, except for purposes of determining the unfunded vested benefits attributable to an employer under section 1391(c)(4) of this title or a comparable method approved under section 1391(c)(5) of this title.[4]

\*   \*   \*   \*   \*   \*   \*

## ERISA Sec. 4219, 29 U.S.C. Sec. 1399

Notice, collection, etc., of withdrawal liability

\*   \*   \*   \*   \*   \*   \*

(b) Notification, Demand for Payment, and Review Upon Complete or Partial Withdrawal By Employer

(1) As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall –

(A) notify the employer of –

(i) the amount of the liability, and

---

[4] This provision was enacted on December 16, 2014, with an effective date of December 31, 2014, as part of the MPRA. See preceding footnote.

(ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

        *   *   *   *   *   *   *

(c) Payment Requirements; Amount, etc.

(1)

(A)

(i) Except as provided in subparagraphs (B) and (D) of this paragraph and in paragraphs (4) and (5), an employer shall pay the amount determined … over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C), ….

        *   *   *   *   *   *   *

(B) In any case in which the amortization period described in subparagraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C).

(C)

(i) … the amount of each annual payment shall be the product of –

(I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

> (II) the highest contribution rate at
> which the employer had an
> obligation to contribute under the
> plan during the 10 plan years
> ending with the plan year in which
> the withdrawal occurs. ...

\* \* \* \* \* \* \*

## ERISA Sec. 4212(a), 29 U.S.C. Sec. 1392(a)

(a) "Obligation to Contribute" Defined. For purposes of
this part, the term "obligation to contribute" means an
obligation to contribute arising

> (1) under one or more collective bargaining (or
> related) agreements, or

> (2) as a result of a duty under applicable labor-
> management relations law, but does not include an
> obligation to pay withdrawal liability under this
> section or to pay delinquent contributions.

\* \* \* \* \* \* \*

## Positions of the Parties

The Fund argues its calculation of the Employer's

annual withdrawal liability installment payment was in

accordance with ERISA. It contends the PPA surcharge and

non-bargained contribution increases imposed upon the

Employer were properly included in the Employer's highest

contribution rate and resulted in an installment payment

amount that was not overstated.

The Fund acknowledges ERISA Section 4219(c) provides
for satisfaction of withdrawal liability via fixed, annual
installment payments calculated as the product of the
average annual number of contribution base units, times the
employer's highest contribution rate at which the employer
had an obligation to contribute, all for the period defined
in the statute. It also recognizes ERISA Section 4212(a)
defines "obligation to contribute" as being an obligation
to contribute arising under a collective bargaining or
related agreement, or as a result of a duty under
applicable labor-management relations law.

Against this backdrop, the Fund maintains the PPA
surcharge imposed upon the Employer by its Rehabilitation
Plan, met the foregoing criteria for inclusion in the
highest contribution rate, because it arose as a result of
a duty under applicable labor-management relations law.

The Fund invokes Section 302 of the Labor Management
Relations Act of 1947 ("LMRA"), in support of its claim. It
contends the LMRA is a labor-management relations law
allowing employers to pay monies to jointly administered
trust funds for the benefit of employees, as an exception
to an otherwise broad anti-corruption measure barring
employers from paying monies to employees (beyond their

normal compensation) or to their representatives, except as enumerated in the statute. In the Fund's view, the surcharge arises under the LMRA because the Fund is a jointly administered trust fund and that law allows such a payment to be made.

The Fund also invokes ERISA in support of its claim the surcharge is an obligation arising under a labor-management relations law. It asserts the provisions of ERISA play a significant role in the collective bargaining relationship, by providing the surcharge will terminate when a collective bargaining agreement is reached whose terms are consistent with the Fund's schedule under the Rehabilitation Plan. The Fund urges this provision, contained in ERISA Section 305(e)(7)(C), gives employers a clear choice of either bargaining a new agreement compliant with the Rehabilitation Plan, or continuing to pay the surcharge, and is evidence the Employer's obligation to pay the surcharge arises under a labor-management relations law.

In the Fund's view, the surcharge meets the statutory test of ERISA Section 4212(a), for inclusion in the highest contribution rate, because it arises from a duty under the foregoing laws. It rejects the notion labor-management

relations laws are limited to the National Labor Relations Act ("NLRA").

The Fund also makes several inferential arguments to support its view the surcharge was properly part of the Employer's highest contribution rate.

The Fund claims surcharges accruing before 2015 were part of the highest contribution rate. It cites no express statutory language for this proposition. Instead, the Fund argues for an inference Congress intended the surcharge be included in the rate before 2015, by passing a law on December 16, 2014, as part of the MPRA, which amended ERISA Section 305 by adding a new subparagraph "g", commanding the surcharge be disregarded in determining the highest contribution rate. It emphasizes this amendment was enacted prospectively, with language in the authorizing legislation stating it would only be effective for surcharges accruing on or after December 31, 2014.

From this amendment, the Fund posits Congress intended a substantive change in the law, from a prior rule which authorized inclusion of the surcharge in the highest contribution rate, to a new rule which required it be disregarded when determining the highest contribution rate. It reasons had Congress intended the surcharge be excluded

from the highest contribution rate prior to December 31,
2014, it would have made the amendment retroactive. The
Fund argues, by negative implication, Congress' decision to
not make the amendment retroactive means it intended
surcharges accruing prior to December 31, 2014, to be part
of the highest contribution rate. It disputes the
Employer's contention this amendment was enacted merely to
re-state or clarify existing law excluding the surcharges
from the highest contribution rate.

The Fund acknowledges its position is at odds with the
recent holding of the U.S. Court of Appeals for the Third
Circuit in *Board of Trustees, IBT Local 863 Pension Fund
vs. C&S Wholesale Grocers, Inc.*, 802 F.3d 534 (3d Cir.,
Sept. 16, 2015). It recognizes in that case, the Court held
PPA surcharges accruing prior to December 31, 2014, are not
part of the highest contribution rate. The Fund insists the
Court wrongly decided the issue and gave insufficient
weight to Congress' prospective amendment of ERISA,
effective December 31, 2014. It suggests the Court was
deprived of full briefing on the question because the
amendment was enacted after the litigants filed their main
briefs. However, the Fund does not dispute the amendment,
and the parties' positions with respect to its impact, if

any, upon the issues before the Court, were brought to the Court's attention via supplemental letter briefs filed prior to oral argument and before the Court reached its decision. It contends the resulting decision by the Third Circuit was erroneous in failing to appreciate the amendment was intended as a substantive change to prior law.

As well, the Fund alleges the Third Circuit's decision is unsound and rests upon an unsupportable distinction between contributions, and contribution rates. It urges the Court's decision departs from prior views expressed by two (2) arbitrators, each of whom ruled PPA surcharges accruing prior to December 31, 2014, were part of the highest contribution rate. The Fund insists the Third Circuit's decision is not a correct statement of the law and should not be followed in this proceeding.

The Fund makes a further inferential argument for inclusion of the PPA surcharge in the highest contribution rate. It contends when the Employer withdrew from the Fund on December 30, 2012, and when the Fund issued its assessment of withdrawal liability on April 11, 2014, the statutory scheme expressly barred use of the surcharge to allocate an employer's share of unfunded vested benefits

under ERISA Section 305(e)(9)(B), but did not expressly
prohibit inclusion of the surcharge in the highest
contribution rate when calculating the amount of the
employer's annual withdrawal liability installment payment
under ERISA Section 4219(c). In its view, by expressly
barring use of the surcharge to determine an employer's
allocable share of unfunded vested benefits, but not
expressly excluding its use in the highest contribution
rate, Congress intended the surcharge be included in the
highest contribution rate.

The Fund argues under ERISA Section 4219(c),
surcharges are contributions and, therefore, part of the
highest contribution rate. It points to wording in a
Technical Explanation of the PPA of 2006, prepared by the
Staff of the Joint Committee on Taxation, referring to the
surcharge as being "an additional required contribution".
The Fund asserts this staff-authored document is part of
legislative history and is evidence Congress viewed the
surcharges as contributions included in the rate.

The Fund also relies upon a certain section heading
above text of the MPRA, as supporting its position. It
asserts a section heading, entitled, "Disregard of Certain
Contribution Increases", appears above the text of the

amendment requiring surcharges accruing on or after December 31, 2014, and contribution increases imposed under a Rehabilitation Plan on or after December 31, 2014, be disregarded when determining the highest contribution rate. The Fund contends placement of this heading over the amendment text is evidence Congress considered the surcharge a contribution increase included in the rate.

As well, the Fund argues statutory language setting the amount of surcharge as a percentage of "… the contributions otherwise required under the applicable collective bargaining agreement", demonstrates Congress viewed the surcharge as an additional contribution, and, therefore, a contribution included in the highest contribution rate. The Fund claims the word "otherwise" in the foregoing provision supports its position.

The Fund alleges provisions of ERISA Section 305(e)(7)(B), which make the surcharge "due and payable on the same schedule as the contributions on which the surcharges are based" and which provide any failure to pay the surcharge will be "treated as a delinquent contribution", support its contention the surcharge is a type of contribution and, therefore, included in the highest contribution rate.

The Fund likewise contends language in ERISA Section 305(e)(7)(E), specifying the surcharge "shall not be the basis for any benefit accrual under the plan", demonstrates Congress viewed the surcharge as a new type of employer contribution, one (1) which would not serve as the basis for benefit accrual, but would still be part of the highest contribution rate. It claims benefit increases for a plan in critical status must be paid from additional contributions not contemplated by the Rehabilitation Plan, and suggests Congress saw a necessity to enact this language to distinguish the surcharge from other types of contributions which would ordinarily be the basis for benefit accruals.

From a policy perspective, the Fund argues inclusion of the surcharge in the highest contribution rate furthers the mission of protecting plan benefits. It emphasizes the statutory scheme already allows many employers to avoid paying the full amount of their withdrawal liability, by providing relief from further payments after twenty (20) years of installments have been paid and by authorizing an annual installment payment comparable to the withdrawing employer's typical contribution in earlier years rather than amortizing the full amount of liability over a fixed

number of years. The Fund suggests exclusion of the surcharge from the highest contribution rate will give withdrawing employers a windfall and place pension funds in further jeopardy of insolvency. It urges including the surcharge as part of the highest contribution rate will lessen the exposure of financially challenged pension plans to these adverse impacts.

As to the contribution increases imposed upon the Employer under the Rehabilitation Plan, the Fund argues their inclusion in the highest contribution rate was proper and in accordance with ERISA. To support this argument, it makes the same inferential arguments made in favor of inclusion of the surcharge.

The Fund contends when Congress amended ERISA Section 305 to require contribution increases accruing after December 31, 2014, be disregarded when determining the highest contribution rate, it did not make the amendment retroactive. Therefore, the Fund maintains Congress intended a substantive change in the law from a prior rule which included contribution increases in the rate, to a new rule which excluded them from the rate. It argues for a further inference Congress intended contribution increases be included in the rate, based upon express statutory

language in effect on December 30, 2012, when the Employer withdrew, and on April 11, 2014, when withdrawal liability was assessed, which required the increases be disregarded when determining an employer's share of allocable unfunded vested benefits, but said nothing about excluding them from the highest contribution rate.

The Fund also argues the non-bargained contribution increases imposed under the Rehabilitation Plan are contribution rates within the meaning of ERISA Section 4219 and are, therefore, part of the highest contribution rate. It emphasizes the PPA refers to schedules of increases set forth in a Rehabilitation Plan as being "contribution rates". The Fund alleges the Employer remitted contributions pursuant to the increased rate set forth in the schedules of the Rehabilitation Plan. For all of these reasons, it claims the contribution increases imposed by the Rehabilitation Plan are part of the highest contribution rate.

Finally, the Fund argues, as it did for the surcharges, the contribution increases imposed by its Rehabilitation Plan meet the definition of an obligation to contribute under ERISA Section 4212(a) and are, therefore, part of the highest contribution rate. It alleges these

increases arose from a duty arising under an applicable labor-management relations law, because a) they would be prohibited under Section 302 of the LMRA but for the exception in that Act allowing payments to Taft-Hartley Funds, and b) because the increases are payable under a duty arising under the PPA, which, in the Fund's view, qualifies as an applicable labor-management relations law.

In short, the Fund insists its inclusion of the PPA surcharge and the non-bargained contribution increases imposed under the Rehabilitation Plan, in the Employer's highest contribution rate, was proper and did not result in an overstated annual installment payment amount. It asks for an Award upholding its determination in all respects.

The Employer, on the other hand, argues the Fund improperly determined its highest contribution rate, in violation of clear statutory provisions, and then used the improper rate to arrive at an annual installment payment amount which was overstated. It alleges the Fund's improper actions produced a schedule which has the Employer paying almost fifteen million ($15,000,000.00) dollars more than required over the twenty (20) year payment period provided by ERISA.

The Employer contends the Fund improperly included the PPA surcharge and the contribution increases imposed under the Fund's Rehabilitation Plan, in the highest contribution rate. It alleges ERISA does not permit the Fund to have done so.

As to the surcharge, the Employer asserts clear and unambiguous language in ERISA Sections 4219(c) and 4212(a) demonstrate Congress intended the only contribution rates included in the highest contribution rate are those which the Employer was obligated to contribute a) under a collective bargaining or related agreement, or b) those arising as a result of a duty under applicable labor-management relations law. It alleges the surcharge does not fit either of these criteria. The Fund claims the holding of the Third Circuit Court of Appeals in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc.*, *supra*, supports its position and establishes the surcharge is not part of the highest contribution rate.

The Employer alleges the surcharge does not meet the first criteria of an obligation to contribute, because it did not arise under a collective bargaining agreement or other related agreement. It contends the surcharge was created by ERISA Sections 305(b)(2) and 305(e)(7), and

automatically imposed by operation of these statutes when the Fund entered critical status. As such, the Employer insists the surcharge is purely statutory and not an obligation arising under any collectively bargained agreement or related agreement.

The Employer maintains its collective bargaining agreement for the two (2) bargaining units in question does not mention the Fund or contain any reference to a negotiated contribution rate. It acknowledges its Participation Agreement with the Union establishes an agreed upon hourly contribution rate of $1.574, but maintains this contractual rate does not include the surcharge. The Employer urges payment of the surcharge satisfies an obligation created by statute but is not a contractual obligation and, therefore, does not meet the first of the criteria for inclusion in the highest contribution rate.

The Employer argues the surcharge does not meet the second of the criteria of ERISA Section 4212(a) for inclusion in the highest contribution rate because it did not arise as the result of a duty under an applicable labor-management relations law. It contends this standard refers to the National Labor Relations Act ("NLRA") and was

equated with the NLRA by the United States Supreme Court in
*Laborers Health and Welfare Pension Trust for Northern
California v. Advanced Lightweight Concrete Co., Inc.*, 484
U.S. 539, 545-546 (1988). The Employer maintains the duty
to pay the automatic surcharge required by ERISA does not
arise under the NLRA and is not a duty arising under an
applicable labor-management relations law. It rejects the
Fund's contention the surcharge arises from any duty
created by the LMRA and disputes the notion Section 302 of
the LMRA creates any duty requiring the Employer pay the
surcharge.

The Employer argues under the statutory scheme,
surcharges are not contributions and, therefore, are not
part of the highest contribution rate. It contends
statutory language in ERISA Section 305(e)(7)(B) making
surcharges "… payable on the same schedule as the
contributions on which the surcharges are based", and
mandating any failure to make a surcharge payment will be
"treated as a delinquent contribution" whose payment is
collectible under ERISA Section 515, shows Congress was
aware surcharges are not the same as contributions. It
suggests if surcharges were the same as contributions,
there would have been no need for Congress to add language

treating them as delinquent contributions to enable collection.

The Employer notes with passage of the MPRA on December 16, 2014, Congress added language to ERISA, expressly requiring surcharges accruing on or after December 31, 2014, be disregarded when determining the highest contribution rate. It insists this new language clarified existing law and was not a substantive change. The Employer asserts the MPRA provision cannot support an inference the prior law included surcharges accruing before December 31, 2014, in the highest contribution rate. It suggests a retroactive provision was not enacted because doing so would have created myriad complications for those withdrawn employers whose time to challenge their plan's demands for withdrawal liability payments, including surcharges, had already run. It claims the Third Circuit considered, but rejected, the contention Congress' prospective adoption of the MPRA was a repeal of existing law.

The Employer maintains it is entitled to an Award sustaining its position, under the aforementioned Court ruling in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc.*, *supra*. It contends in that

case, the District Court held, and the Third Circuit affirmed, that PPA surcharges accruing before December 31, 2014, are not part of the highest contribution rate. The Employer points out the District Court rejected an arbitration award, one (1) of two (2) relied upon by the Fund herein, which had upheld a plan's inclusion of PPA surcharges in the withdrawing employer's highest contribution rate. It emphasizes the Third Circuit affirmed the holding of the District Court and ruled inclusion of the surcharge in the highest contribution rate was improper because it did not arise under a collective bargaining agreement or from a duty under applicable labor-management relations law. In the Employer's view, the same result should apply, here. It asserts the Fund's arguments regarding legislative history and canons of statutory construction are unavailing in the face of the Court's holding, which was based upon clear and unambiguous statutory language.

The Employer takes issue with the Fund's claim the impact of the MPRA upon the underlying issues was not fully briefed to the Third Circuit. It asserts enactment of the MPRA on December 16, 2014, and its impact upon the case, were briefed to the Third Circuit by letter briefs on

December 31, 2014, and January 5, 2015, and thoroughly discussed during oral argument before the Court on January 12, 2015.

The Employer acknowledges when it withdrew from the Plan in December of 2012, relevant portions of ERISA required the surcharge be disregarded in determining the allocation of unfunded vested benefits to an employer. However, it disputes the Fund's contention disregard of the surcharge for this purpose meant it was intended to be included for all other purposes, including calculation of highest contribution rate. The Employer insists the District Court and Third Circuit each considered, and rejected, that contention in setting aside the arbitrator's award for improper inclusion of the statutory surcharge in the highest contribution rate.

The Employer alleges the Fund's effort to persuade "surcharges are contributions" is analytically unsound and rests upon a contention rejected by the District Court and the Third Circuit. It views as illogical the Fund's arguments concerning the difference drawn by the Court between "contributions" and "contribution rates".

The Employer takes issue with the Fund's argument the surcharge obligation arises from a duty under applicable

labor-management relations law. It views the Fund's argument as conclusory and flawed. The Employer asserts the relevant portions of ERISA and the PPA regulate its relationship with the Fund, but do not impact the bargaining relationship between the Employer and the Union or change the terms of its negotiated agreement with the Union. The Employer emphasizes under the Third Circuit's ruling, even if the PPA were considered an applicable labor-management relations law, PPA surcharges are not part of contribution rates and, therefore, are not included in the highest contribution rate.

The Employer contends the Fund's policy argument surcharges should be included in the rate because doing so furthers the ultimate statutory goal of protecting pension benefits for participants, is insufficient to overcome plain statutory language regarding the specific issue at hand. It maintains clear provisions of ERISA require a finding the surcharge is not part of the highest contribution rate. The Employer urges I have no authority to re-write the statute but must apply the law according to its terms.

The Employer asserts the Fund's inclusion of contribution increases imposed under its Rehabilitation

Plan, was likewise, improper. It acknowledges in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc, supra*, no issue was presented whether non-bargained contribution increases are part of the highest contribution rate. Nevertheless, the Employer insists the Courts' rationale for holding the surcharge is not part of the rate, based upon statutory language found to be clear and unambiguous, also warrants a finding the contribution increases imposed by the Fund are not part of the rate and should not have been included.

The Employer argues the contribution increases imposed under the Fund's Rehabilitation Plan do not belong in the highest contribution rate because they do not meet the statutory criteria for inclusion under ERISA Section 4212(a). It alleges the contribution increases are non-bargained, non-contractual obligations, and were imposed by operation of law after the Employer's Agreement with the Union expired and a new Agreement complying with scheduled increases set forth in the default schedule of the Rehabilitation Plan, was not adopted. As such, the Employer claims the increases do not meet the first of the criteria of having arisen under a collective bargaining agreement, or related agreement. It contends the increases do not meet

the second of the criteria for inclusion because they did
not result from any duty under a labor-management relations
law. For the same reasons discussed, above, on the
surcharge issue, the Employer urges LMRA Section 302 and
the relevant portions of ERISA do not support the Fund's
position the increases met the criteria of arising from a
duty owed under an applicable labor management relations
law.

Similarly, as asserted with regard to the surcharge
issue, the Employer disputes the Fund's inferential
arguments Congress intended the contribution increases as
part of the highest contribution rate. As well, it argues
the Fund's remaining contentions offered to support
inclusion of the non-bargained contribution increases in
the highest contribution rate are without merit.

In short, the Employer insists the Fund's inclusion of
the PPA surcharge, and the contribution increases imposed
under its Rehabilitation Plan, in the highest contribution
rate, was improper and not authorized by ERISA. It asks an
Award be issued directing the Fund to properly determine
the Employer's highest contribution rate, without
accounting for the PPA surcharge and the contribution rate
increases imposed under the Fund's Rehabilitation Plan, and

to revise the withdrawal liability annual installment payment schedule, accordingly.

## Opinion

Certain preliminary comments are appropriate. As arbitrator, my role is to resolve this dispute, giving due regard to the laws and regulations governing pension funds, their purposes, and the interests they were enacted to protect. I am also commanded to determine this matter according to fair and equitable procedures. 29 U.S.C. Sec. 1401(a)(2).

At the outset, there is no question the Employer withdrew from the Fund and incurred withdrawal liability. The parties dispute whether the Fund properly computed the amount of the Employer's annual withdrawal liability installment payment. The question I must decide is whether the Fund's inclusion of the PPA surcharge and the non-bargained contribution increases, as part of the Employer's highest contribution rate used to calculate the annual installment payment, was proper under ERISA.

Upon my careful examination of the evidence and arguments presented, I conclude the Fund improperly

included the PPA surcharge in the Employer's highest contribution rate. I also find it improperly included the non-bargained contribution increases, imposed under the Rehabilitation Plan, in the Employer's highest contribution rate. As discussed below, I find these items were not part of the highest contribution rate, as defined by ERISA. Their inclusion resulted in the Fund using a rate higher than authorized by ERISA, and produced an annual installment payment amount which was overstated.

Accordingly, I shall direct the Fund to a) re-determine the Employer's highest contribution rate, without accounting for the automatic PPA surcharge and the non-bargained contribution rate increases imposed by the Fund, b) re-calculate the amount of the Employer's annual withdrawal liability installment payment and c) revise and re-issue the Employer's withdrawal liability annual installment payment schedule, accordingly. I shall also direct any overpayments in the amounts due on the revised schedule be credited to future installment payment obligations of the Employer.

It is well settled employers who withdraw from multi-employer pension plans are subject to withdrawal liability for their share of unfunded vested benefits. Congress

established withdrawal liability as an integral part of its regulation of multi-employer pension plans. Under the statutory scheme, payment of withdrawal liability is authorized via annual withdrawal liability installment payments.

Two (2) ERISA statutes define how to determine the amount of a withdrawn employer's annual withdrawal liability installment payment. ERISA Section 4219(c), *supra*, provides in pertinent part:

**(i) … the amount of each annual payment shall be the product of**

**(I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and**

**(II) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs. …**

In turn, ERISA Section 4212(a), *supra*, defines "obligation to contribute", for these purposes, as meaning:

**… an obligation to contribute arising (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor - management relations law, but does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.**

By these two (2) provisions, I find Congress has required the highest contribution rate arise under a collective bargaining agreement or related agreement, or result from a duty imposed by applicable labor-management relations law. This requirement is set forth in clear, unambiguous, statutory language. It provides the framework for resolution of the parties' dispute.

As to the PPA surcharge, I conclude it is not part of the highest contribution rate. The surcharge is created and imposed by a statute, ERISA Section 305(e)(7)(A). The record establishes it was not collectively bargained and is not referred to in any collective bargaining agreement, or related agreement, to which the Employer is a party. While the Participation Agreement between the Employer and Union contains an agreed upon contribution rate of $1.574 per hour, it is undisputed this rate does not include any surcharge amount.[5] Under these circumstances, I conclude the PPA surcharge does not meet the test of being an obligation arising under a collective bargaining agreement or related agreement.

---

[5] The Fund added the PPA surcharge to the agreed upon rate in calculating the Employer's highest contribution rate.

Nor can I find the PPA surcharge meets the test of being a contribution rate arising as the result of a duty under an applicable labor-management relations law. I reject the Fund's argument the surcharge results from a duty created by Section 302 of the LMRA. While the LMRA is a labor-management relations law, nothing in Section 302 obligates an employer to contribute monies to a pension fund.

Instead, Section 302 bars employer payments to unions and union representatives except as allowed under specific exceptions, and criminalizes payments made in violation of its provisions. The exception relied upon by the Fund, allowing payments to a jointly administered trust fund, permits employers to make such payments, but does not require they do so. Therefore, I find the Employer's obligation to pay the statutory surcharge cannot reasonably be viewed as arising from a duty created by Section 302 of the LMRA because that Section does not establish any duty to pay monies to a pension fund.

While the surcharge does arise from an obligation created by ERISA Section 305(e)(7)(A), I am not convinced this provision constitutes a labor-management relations

law. Unlike the NLRA, which directly regulates bargaining between employers (management) and unions (labor), or Section 302 of the LMRA, which prohibits certain monetary payments from an employer to a union, the provisions of ERISA affecting this matter do not regulate the relationship between an employer and union. Instead, it is clear ERISA Section 305(e)(7)(A) establishes duties between the employer and a fund. The surcharge is imposed upon the employer and made payable to a fund, to assist the fund in recovering from critical status.

While the costs an employer must bear in paying the surcharge may indirectly affect its stance at the bargaining table when negotiating wages and benefits, nothing in the cited ERISA provision requires the employer and union alter their collective bargaining agreement to take account of the statutory surcharge. Since the ERISA statutes do not directly regulate the relationship between the Employer and Union, I cannot find they are an applicable labor-management relations law. Therefore, the surcharge created under ERISA does not qualify for inclusion in the highest contribution rate under the criteria.

My conclusion is not altered by the contents of ERISA

Section 305(e)(7)(C), which provide the surcharge will

terminate upon adoption of a collective bargaining

agreement whose terms are consistent with the schedule set

forth in the Rehabilitation Plan. This provision does not,

by its terms, require an employer and union bargain a new

accord or alter their agreement to take account of the

surcharge. Under the statutory scheme, I find those parties

are free to consider the added labor cost imposed by the

surcharge in their negotiations, the same as any other cost

factors, but are not required by the terms of the statute

to alter their agreement or adjust its terms. While the

surcharge provision of ERISA plainly imposes an added cost

upon the employer, it does not go so far as to regulate the

conduct of the employer and the union towards each other,

or otherwise define their relationship.[6]

---

[6] In *Laborers Health and Welfare Pension Trust for Northern
California v. Advanced Lightweight Concrete Co., Inc.*,
*supra*, the United States Supreme Court construed ERISA
Section 4212(a)(2)'s definition of an "obligation to
contribute" as a result of a "duty under applicable labor-
management relations law", as meaning the duty imposed upon
an employer by the NLRA to continue the *status quo ante*
after a collective bargaining agreement has expired and
while negotiations for a successor agreement are underway.
(*Id.* 484 U.S. at 545 – 546). Plainly, the duty to continue
the *status quo ante* is a duty owed to the union by the
employer, and a further aspect of their relationship as
defined by the NLRA. On the other hand, the ERISA surcharge

In contrast, the NLRA is beyond doubt a labor-management relations law. It directly regulates integral aspects of the relationship between employers and unions, including the fostering of the rights of employees to organize and bargain collectively with the employer over terms and conditions of employment, prohibiting unfair labor practices and establishing an agency, the National Labor Relations Board ("NLRB"), for adjudication of violations of the Act. I do not find the ERISA provisions relied upon by the Fund constitute a labor-management relations law, because they do not regulate the Employer and Union in their relations toward each other.

Since the surcharge does not arise from a collective bargaining agreement or related agreement, and is not an obligation resulting from a duty imposed by an applicable labor-management relations law, it is not part of the highest contribution rate under the statutory test of ERISA Section 4212(a). Therefore, I find, the Fund's inclusion of the surcharge in the highest contribution rate, was improper and not authorized by the statutory scheme.

---

statute establishes a duty owed by the employer to the fund.

My conclusion is supported by the recent holding of the Third Circuit in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc.*, *supra*. In that case, upon facts which arose before December 31, 2014, the Court held the surcharge is not part of the highest contribution rate and does not meet the test prescribed by ERISA Section 4212(a). The Court stated: "Thus, we must decide if the surcharge arises under either the CBAs or an 'applicable labor – management relations law'. We conclude that the surcharge does not arise under either". (*Id.*, 802 F.3d at 543). The Court emphasized contribution rates are set by collective bargaining agreements, while PPA surcharges are set by statute. It eschewed deeming the surcharge a contribution rate, recognizing the essential distinction between collectively bargained contribution rates, and non-contractual charges imposed by statute.[7]

I reject the Fund's argument for an inference Congress intended surcharges accruing before December 31, 2014, to

---

[7] The Third Circuit also reasoned, even if the PPA were assumed for argument purposes only to be a labor-management relations law, the surcharge would still not meet the statutory test (of being a contribution rate originating from a duty under an applicable labor-management law) because it is not part of contribution rates. *Id.*, at 544-545.

be part of the highest contribution rate, based upon a prospective provision of the MPRA which added language to ERISA Section 305 explicitly stating the surcharge was to be disregarded, for surcharges accruing on or after December 31, 2014, when determining the highest contribution rate. This very same contention was rebuffed by the Third Circuit, which noted, quite clearly, "… it would be a hazardous venture for us to draw any conclusions from the enactment of the MPRA". (*Id.*, 802 F.3d at 546).[8] The Court observed there is a dearth of legislative history or clear statutory language to support this argument and ruled the PPA surcharge "… should not be included in Woodbridge's annual payment of its withdrawal liability". (*Id.*, at 546 - 547).

I also reject the Fund's argument Congress intended to include the surcharge in the highest contribution rate because the statutes expressly barred the surcharge from being used to allocate a withdrawn employer's share of unfunded vested benefits, but did not expressly prohibit its inclusion in the highest contribution rate when calculating the annual withdrawal liability installment

---

[8] The Court also said, "it remains the function of the courts and not the Legislature … to say what an enacted statute means". (*Id.*, at 546).

payment amount. This argument was also rejected by the Third Circuit. The Court found no basis for the negative implication underlying this contention, because surcharges are distinct from contributions and not part of the contribution rate, so there would have been no need for Congress to expressly exclude them from the highest contribution rate. (*Id.,* at 545).

More fundamentally, I find the above inferences sought by the Fund are not tenable for the further reason they are at odds with the plain language of ERISA Section 4212(a), which limits inclusion in the highest contribution rate to those contribution rates owed under a collective bargaining agreement or related agreement or resulting from a duty imposed by applicable labor-management relations law. This clear statutory requirement was not met by the automatic surcharge imposed upon the Employer. It would be illogical to infer Congress intended a surcharge be included in the highest contribution rate, when that surcharge did not meet the statutory test for inclusion.[9]

---

[9] For the same reason, the textual and heading arguments made by the Fund are not persuasive. Those arguments ignore a dispositive fact, namely: the surcharge imposed upon the Employer does not meet the statutory requirement of ERISA Section 4212(a) for inclusion in the highest contribution rate.

The Fund's contention the Third Circuit decision should not be followed because it rests upon an unsupportable distinction between contributions, and contribution rates, is not convincing. While the Court perceived an intention by Congress to make such a distinction, the distinction was not pivotal to the Court's ruling. Instead, the Third Circuit's decision turns upon the central difference between contributions, which are contractual payments made by the employer at rates agreed upon in the collective bargaining agreement or other related agreement, and the surcharge, a non-contractual obligation set by statute. The Court cited this fundamental difference in its determination the surcharge is not part of the highest contribution rate. I find the Court's holding reasonably reflects the statutory rules, and should be followed.

The Fund's reliance upon wording in a Technical Explanation for the PPA of 2006, as evidence Congress created the surcharge as a contribution and intended its inclusion in the highest contribution rate, is misplaced. Although committee staffers who authored the document referred to the surcharge as being, "an additional contribution", the cited verbiage is not statutory language

and was not enacted into law. No provision of ERISA has been identified in which the surcharge is defined in the law as being a "contribution" or an "additional contribution". Therefore, reference in the document to the surcharge as being "an additional contribution" is without statutory support and cannot be credited as evidence of what Congress intended.

The Fund's additional claims Congress intended to equate the surcharge with contributions by setting the amount of the surcharge as a percentage of "… the contributions otherwise required under the applicable collective bargaining agreement", by making the surcharge "due and payable on the same schedule as the contributions on which the surcharges are based", by providing any failure to pay the surcharge will be "treated as a delinquent contribution", and by specifying the surcharge "shall not be the basis for any benefit accrual under the plan", are not persuasive. Suffice it to say, the statutory scheme treats the surcharge as something other than a contribution. Otherwise, there would be no need to specify the surcharge will be payable on the same schedule as contributions and treated as a delinquent contribution in the event of a default.

Moreover, these contentions miss the mark. Congress has enacted statutes which require the annual installment payment be calculated using the highest contribution rate, and has required that rate be an obligation arising from a collective bargaining agreement or related agreement or result from a duty under applicable labor management relations law. Since the surcharge does not meet this test, it is not part of the highest contribution rate. The Fund's arguments to the contrary are unavailing.[10]

I recognize the Fund has presented the awards of two (2) arbitrators who concluded the surcharge is a part of the highest contribution rate. However, the first of those awards, issued on November 21, 2012, in *Matter of the Arbitration Between IBT Local 863 Pension Fund and C&S Grocers, Inc./Woodbridge Logistics*, was directly overruled by the District Court and Third Circuit decisions in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc. supra.* Those Courts rejected the arbitrator's

---

[10] The policy arguments made by the Fund are likewise rejected. As an Arbitrator, I am bound to determine this dispute in accordance with the pertinent statutes. I have no authority to ignore clear statutory provisions under the guise of interpretation, or to approve inclusion of the surcharge in the highest contribution rate when the surcharge does not meet the statutory test for inclusion.

conclusion and held the surcharge was not part of the highest contribution rate. The second of those awards, issued on April 5, 2013, in *Matter of the Arbitration Between IBT Local 863 Pension Fund and American B.D. Company*, is at odds with the aforementioned decisions by the District Court and Third Circuit. I find these two (2) awards, relied upon by the Fund, are not persuasive and give insufficient regard to the statutory test, prescribed in ERISA Section 4212(a), for inclusion in the highest contribution rate. Instead, I am convinced the District and Third Circuit courts in *Board of Trustees, IBT Local 863 Pension Fund vs. C&S Wholesale Grocers, Inc.*, *supra*, properly construed the statutory scheme in holding the surcharge was not part of the highest contribution rate.

Thus, for all of the foregoing reasons, it is my determination the Fund improperly included the surcharge in the Employer's highest contribution rate.

As to the contribution increases implemented under the Rehabilitation Plan, I find these were improperly included in the Employer's highest contribution rate. These increases do not meet the statutory test for inclusion in the rate.

It is undisputed the increases were not agreed upon in any collective bargaining agreement or related agreement. Instead, they were implemented under a Rehabilitation Plan issued, unilaterally, by the Fund. As such, the increases are not an obligation arising from a collective bargaining agreement or related agreement.

I also find these contribution increases were not payable as a result of a duty arising under a labor-management relations law. The Fund's reliance upon Section 302 of the LMRA is misplaced for the same reasons discussed above regarding the surcharge issue. Although Section 302 allows payments to a jointly administered trust fund, it does not require such payments be made. Therefore, the Employer's obligation to pay these contribution increases cannot reasonably be viewed as arising from a duty created by Section 302 of the LMRA because that Section does not establish any duty to pay monies to a pension fund.

Although the Fund is correct the Employer's obligation to pay the contribution increases arises from a duty created by ERISA Section 305(e)(1), I conclude this statute is not a labor-management relations law, for the same reasons discussed above on the surcharge issue. ERISA Section 305(e)(1) is not a labor-management relations law

because it does not regulate the relationship between the employer and union. Instead, I find it directly regulates the relationship between the employer and a fund, by requiring a fund establish a Rehabilitation Plan with benefit reductions and contribution increases and by authorizing a fund to impose those increases directly upon employer. Nothing in the statute requires an employer and union alter their collective bargaining agreement to take account of the contribution increases.[11] Since this ERISA provision does not directly regulate the relationship between employer and union, I cannot find it is an applicable labor-management relations law.

In light of my findings, I conclude the contribution increases imposed upon the Employer do not meet the statutory test prescribed in ERISA Section 4212(a) for inclusion in the highest contribution rate. Therefore, I find the Fund acted improperly when it included them in the rate used to calculate the amount of the Employer's annual installment payment.

---

[11] In fact, the Fund implemented the increases, under authority of the statute, without their having been agreed upon by the Employer and Union and after one hundred eighty (180) days had passed since expiration of the Agreement.

My conclusion is supported by the Court's ruling in
*Board of Trustees, IBT Local 863 Pension Fund vs. C&S
Wholesale Grocers, Inc., supra*. Although the facts before
the Court did not include contribution increases imposed
upon an employer nor any issue whether such increases are
part of the highest contribution rate, I find it noteworthy
the Court gave great weight to the test set forth in ERISA
Section 4212(a) in deciding the automatic surcharge imposed
upon the employer in that case was not part of the rate.
(*Id.*, 802 F.3d at 543).[12] There is no question the
contribution increases imposed by the Fund must meet the
same statutory test.

Since the contribution increases imposed upon the
Employer did not arise under a collective bargaining
agreement or related agreement, or from a duty under an
applicable labor-management relations law, they do not meet
the statutory test for inclusion and are not part of the
highest contribution rate.

My conclusion is not altered by the Fund's assertion
these increases are referred to in the ERISA statutes as

---

[12] The Court stated: "Thus, we must decide if the surcharge
arises under either the CBAs or an 'applicable labor –
management relations law'.  We conclude that the surcharge
does not arise under either". (*Id.*, 802 F.3d at 543).

contribution "rates". Even if the law calls them "rates", these non-bargained increases still do not meet the test, set forth in ERISA Section 4212(a), for inclusion in the highest contribution rate.

Therefore, for all of the foregoing, I find the Fund's inclusion of the PPA surcharge, in the rate used to calculate the Employer's annual withdrawal liability installment payment, was improper and not authorized by ERISA. I also find its inclusion of non-bargained contribution increases, imposed from the Fund's Rehabilitation Plan, in the rate used to calculate the Employer's annual withdrawal liability installment payment, was improper. These items were not part of the highest contribution rate, as defined by ERISA. Their inclusion resulted in the Fund using a rate higher than authorized by ERISA, and produced an annual installment payment amount which was overstated.

Accordingly, I shall direct the Fund to a) re-determine the Employer's highest contribution rate, without accounting for the automatic PPA surcharge and the non-bargained contribution rate increases imposed by the Fund, b) re-calculate the amount of the Employer's annual withdrawal liability installment payment and c) revise and

re-issue the Employer's withdrawal liability annual installment payment schedule, accordingly. I shall also direct any overpayments in the amounts due on the revised schedule be credited to future installment payment obligations of the Employer.

**AWARD**

1.  The Fund's inclusion of the PPA surcharge in the rate used to calculate the Employer's annual withdrawal liability installment payment, was improper and not authorized by ERISA.

2.  The Fund's inclusion of non-bargained contribution increases, imposed from its Rehabilitation Plan, in the rate used to calculate the Employer's annual withdrawal liability installment payment, was improper and not authorized by ERISA.

3.  As remedy, the Fund shall a) re-determine the Employer's highest contribution rate, without accounting for the automatic PPA surcharge and the non-bargained contribution rate increases imposed by the Fund, b) re-calculate the amount of the Employer's annual withdrawal liability installment payment and c) revise and re-issue the Employer's withdrawal liability annual installment payment schedule, accordingly.

4.  Any overpayments in the amounts due on the revised schedule shall be credited to future installment payment obligations of the Employer.

5.  I shall retain jurisdiction for the sole purpose of determining any disputes regarding No. 4 of this Award.

May 24, 2016.

_____
Martin F. Scheinman, Esq.
Arbitrator

```
STATE OF NEW YORK      )
                       )    ss.:
COUNTY OF NASSAU       )
```

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

May 24 2016.

_____
Martin F. Scheinman, Esq.
Arbitrator

Domtar.AND.REVISED